# UNITED STATES DISCTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

_____x

KENT SALVESON, ESQ., and EQD, LLC,
A Nevada limited liability company,

                  Plaintiffs,                **COMPLAINT FOR
DECLARATORY RELIEF**

     v.

SUNG YI, an individual,

                  Defendant.

_____x

Plaintiffs Kent Savleson, Esq., and EQD, LLC, a Nevada limited liability company

("EQD"), allege as follows:

## **INTRODUCTION**

1.      Kent Salveson and EQD (collectively the "Plaintiffs") seek declaratory relief in

this suit brought against Defendant Sung Yi ("Yi"), in his individual capacity and as the former

100% member of EQD. Simply stated, an actual controversy has arisen and now exists between

the Parties concerning the legal rights of the Plaintiffs as it relates to the true owners of EQD's

assets. On July 2, 2016, the Defendant transferred all of his membership interests in EQD to

Plaintiff Savleson and included in this transfer were all of EQD's assets. The Plaintiffs

respectfully request a declaration of rights that the Defendant did indeed transfer 100% of EQD's

membership to Salveson, which included EQD's asset(s). Along this line, the Plaintiffs seek to

have included in the declaratory judgment that EQD's assets were transferred on July 2, 2016,

and that EQD did not enter into any contracts to sell its assets to any third parties when the Defendant transferred EQD to Salveson.

2.      As it turns out, the Defendant failed to properly protect EQD's assets because he signed a contract in his individual capacity (not on behalf of EQD) to sell EQD's assets in an option contract to a third party, before he transferred EQD to Salveson.

3.      Plaintiff Salveson paid Yi more than $400,000.00 for EQD and EQD's assets. In exchange for these funds, Plaintiff Salveson was to have received 100% ownership interest in EQD, which included both the membership interests and assets, and this occurred on July 2, 2016.

Savleson purchased EQD as a bona fide purchaser from Yi, and EQD's assets were supposed to be sold free and clear of all liens, encumbrances and option contracts to sell to other potential buyers. As it turns out, however, Yi signed an option contract to sell EQD's assets *before* he sold it to Salveson. Salveson purchased EQD on July 2, 2016 and was informed that EQD was sold free and clear and that there were no other purchasers and certainly no purchasers with option contracts.

Indeed, since July 2, 2016, EQD has been conducting business and maintaining its real estate asset, a condominium located at 450 W. 17th Street, Unit 1009, New York, New York (the "Condo"). Defendant warranted, when he transferred 100% of EQD's membership and the Condo to Salveson, that the transfer was not subject to any liens, judgments, contracts, option contracts, liabilities, disputes, claims of ownership from prior owners, loans or potential litigation. A dispute, however, has arisen as to whether there has been a complete transfer of EQD's membership interests and its assets, but this dispute can be rectified by a declaratory judgment. Attached to this Complaint is Yi's sworn deposition testimony where he admits that

he transferred 100% of EQD's membership to Plaintiff Salveson, and he also agreed to transfer EQD's asset to Salveson. Defendant Yi, however, failed to inform Plaintiff Salveson that he signed an option contract in 2015, possibly granting EQD's first owner an option to re-purchase EQD and EQD's assets. Part of the controversy here is to determine that Yi did transfer 100% of EQD's membership interest and asset to Salveson. The Plaintiffs also seek a declaratory judgment that EQD never signed an option contract with any party to re-purchase any of its assets. At all times herein, and since 2015, EQD has been the sole owner of the Condo and therefore it is the only party that could have entered into an option contract to sell its assets. Most assuredly, EQD never signed any option contracts to sell its assets to any party. But, by signing an option contract as an individual, the Defendant has left EQD subject to attack in court to dispute over who owns title to its asset. It is anticipated, however, that Yi will consent to a declaratory judgment in this Case so that this Court can enter an order that Yi transferred 100% of EQD and its sole asset to Salveson. Yi is also expected to agree to have this judgment entered *Nunc Pro Tunc* to July 2, 2016 and will likely consent that EQD did not sign any option contracts while he was the sole owner and member of Plaintiff EQD, LLC.

4.       Therefore, Plaintiffs Kent Salveson, Esq., and EQD, seek an order declaring that Defendant transferred 100% of EQD to Salveson as of July 2, 2016, and when Defendant transferred his membership interests in EQD, he also transferred EQD's assets to Salveson and that as of July 2, 2016, EQD did not sign any contracts, options or otherwise, to sell its assets to any third party.

## JURISDICTION

5.       This is an action for Declaratory Relief and Declaratory Judgment. This Court has jurisdiction under 28 U.S.C. § 1332 and 2201 because (i) there is an actual controversy between

the parties, (ii) the amount in controversy exceeds $75,000.00 (the Defendant owes the Plaintiffs $400,000.00 of membership interests and assets of EQD), and (iii) there is complete diversity of citizenship.

6.      This Court has personal jurisdiction over the Defendant and venue in this jurisdiction is proper pursuant to Rule 4 of the Federal Rules of Civil Procedure because; (1) Defendant is a resident of California; (2) Plaintiff Salveson is a resident of Reno, Nevada; (3) EQD, while a Nevada limited liability company, is both registered to do business in New York and its asset, the Condo, is situated in the City of New York, State of New York.

## VENUE

7.      Venue is also proper in this judicial district pursuant to 28 U.S.C. § 1391 (b)(2) as a substantial part of the events or omissions giving rise to the action occurred in this judicial district. When Defendant purchased the Condo and transferred his membership interests in EQD, he knew that EQD's asset was real estate located in the City of New York, County of New York. Defendant also knew, at the time of the transfer, that the Plaintiffs intended to both control 100% of EQD and also control EQD's assets, all located in New York, New York.

## PARTIES

8.      Plaintiff Kent Salveson is an attorney with a residence in Reno, Nevada. Since July 2, 2016, Plaintiff Salveson is currently the 100% membership interest holder of Plaintiff EQD, LLC. Indeed, attached as Ex. "A" to this Complaint is the Yi deposition transcript, evidencing the transfer from Defendant Yi to Plaintiff Salveson. Included in this ownership interest, Plaintiff Salveson was supposed to have ownership and control over Plaintiff EQD's sole asset, the Condo.

9.      Plaintiff EQD is a Nevada limited liability company that is registered to do business here in the State of New York and when the Defendant transferred EQD to Salveson, he knowingly transferred EQD's sole asset, the Condo.

10.     Defendant Sung Yi is a resident of the State of California. Defendant Yi was the 100% owner of Plaintiff EQD. When Yi sold EQD to Salveson, he accepted almost $400,000.00 from Salveson and Yi intended the Condo to be transferred along with 100% interest of EQD.


**FACTUAL BACKGROUND**

Defendant Yi Acquired EQD, LLC

11.     On or about July 12, 2013, Steve Woo ("Woo") formed EQD, LLC. At the time Woo formed EQD, he owned the Condo. Approximately two years later, on August 25, 2015, Woo, transferred title of the Condo to EQD, LLC.

12.     Prior to the transfer of the Condo to EQD, Woo and Yi were personally liable to Pacific Mercantile Bank ("PMB") for a $250,000.00 loan. (Dep. Trans., Vol. I, p.11, L-8-23). Woo defaulted on the PMB loan, and PMB filed suit against Woo and Yi (Yi was the personal guarantor of the PMB loan) to recover the loan proceeds. (Dep. Trans., Vol. I., p. 13, L-15-20) To resolve PMB's lawsuit, Yi borrowed $321,000.00 and paid it to PMB and in exchange, PMB entered into a settlement agreement. (Dep. Trans., Vol. I, p.15, L-5-20) At the time of the settlement with PMB, Woo transferred the Condo to EQD, and Woo then transferred EQD to Yi because Woo did not have the funds to pay PMB's settlement amount. (Dep. Trans., Vol. I, pp. 16-17, L22-4)

13.     The agreement between Yi and Woo was: "...in order to pay my [Yi's] friend back [for the settlement funds paid to PMB], I was going to take ownership of EQD/condo and

then I was going to get a loan, borrow money off an interest in the condo and basically pay off the loan from my friend..." (Dep. Trans., Vol. I, p.20, L-10-14)

14.     Woo transferred 100% of EQD to Yi and when this transfer happened, it was in no way a loan for Woo; it was not a financing arrangement with Woo, there were no contingencies, conditions, or post-closing conditions. (Dep. Trans., Vol. I, p. 21, L-8-25) When this transfer occurred, Yi understood it to mean that he was the 100% owner of Plaintiff EQD, and that EQD's asset was the Condo. (Dep. Trans., Vol. I, p. 22, L3-14)

15.     Therefore, on September 1, 2015, Woo executed EQD's membership certificate that transferred 100% of EQD to Yi for $321,000.00 and the purchase of EQD by Yi from Woo vested all right, title and interest in EQD and its assets to Yi as the new 100% member and owner of Plaintiff EQD.

The Current Controversy Between The Parties

16.     On October 15, 2015, however, Yi and Woo signed an option contract where in exchange for $10,000.00 to keep the option open, Woo had the right to re-purchase the Condo at an estimated value of $760,000.00.

17.     Woo never paid Yi $10,000.00 for the option, and in fact Woo never paid Yi anything for the option. Therefore, Woo never paid the consideration to keep the option to purchase open, thereby losing the option.

18.     In any event, on July 2, 2016, Yi transferred Plaintiff EQD to Plaintiff Salveson and in exchange, Salveson paid Yi almost $400,000.00. Plaintiff Salveson's purchase of EQD included the Condo.

19.     When Yi sold EQD (and EQD's assets) to Salveson, Yi did not tell Salveson that he signed an option contract with Woo on October 15, 2015. Notably, the option was between

Woo and Yi as an individual but by the time the option contract was signed, EQD was the owner of Condo and therefore, the option contract was not enforceable because it was signed by the wrong party to be charged. Yi did not own the Condo, so he did not have authority to sign any options to re-purchase it to any party. Part of the relief requested in this action for declaratory judgment is that this Court enter an order that Yi did not subject EQD to any contracts to sell its assets.

Of great significance, the October 15, 2015 option contract signed by Woo and Yi was not discovered until July 2020, prompting the filing of this declaratory relief action.

20.     Based on the attached deposition testimony of Yi, it is anticipated that Yi will consent to a declaratory judgment stating that EQD did not execute any option contracts with any party and that 100% of EQD and EQD's asset (i.e., the Condo) was transferred to Savleson on July 2, 2016.

21.     As things stand now, however, without a declaratory judgment stating that EQD was transferred to Savleson on July 2, 2016, a controversy has arisen as to whom owns EQD and when, and if there were any options to re-purchase EQD and or its assets from the time Yi transferred it.

22.     Yi failed to notify Salveson that he signed an option contract (in his individual capacity) on October 15, 2015. Even though the option was never exercised because the holder of the option never paid the consideration, this request for declaratory relief is to include that all contracts, other than the transfer of EQD to Salveson dated before July 2, 2016, are null and void to ensure that Yi did not enter into any contracts on EQD's behalf while he owned EQD and then once he transferred it to Salveson on July 2, 2016.

## COUNT I

## (FOR DECLARATORY JUDGMENT)

23.     Plaintiffs re-adopt and re-allege paragraphs 1-22 as though fully set forth herein.

24.     A current dispute exists between the parties concerning whether: (i) Yi transferred 100% of EQD to Plaintiff Salveson, and (ii) whether or not Yi subjected EQD to any contracts (options or otherwise) to sell EQD's assets to a third party.

25.     Yi failed to inform Salveson that he signed an option to sell the Condo. While Yi was not the owner of the Condo (because EQD was the owner when Yi acquired EQD), Yi has now left EQD subject to attack by any party that could try to claim that it has a contract to purchase EQD or EQD's assets.

26.     As the attached deposition testimony demonstrates, Yi intended to transfer 100% of EQD to Plaintiff Salveson, including EQD's assets. (Dep. Trans., Vol. II, p.30, L6-10)

27.     Plaintiffs have fulfilled their contractual obligations – Plaintiff Salveson paid Yi close to $400,000.00 to purchase both EQD as a limited liability company, and its asset which is the Condo.

28.     This transaction occurred on July 2, 2016, and the Plaintiffs are within their rights to request that this Court enter a judgment declaring that Yi did indeed transfer 100% of EQD and its asset (the Condo) to Salveson on July 2, 2016, and that there were no contracts (options or otherwise) to purchase any of EQD's assets once Yi transferred EQD and the Condo to Plaintiff Salveson on July 2, 2016.

29.     Therefore, by reason of Plaintiffs' performance and Defendant Yi's sworn deposition testimony attached hereto as Ex. "A" to this Complaint and incorporated by reference, the Plaintiffs are entitled to a declaration that (i) Plaintiff Salveson is the 100% member of EQD,

LLC; (ii) that Defendant Yi transferred 100% of EQD, LLC to Plaintiff Salveson on July 2, 2016, (iii) that EQD is not subject to any contracts to sell any of its assets; and (iv) that this declaratory judgment be entered *Nunc Pro Tunc* to July 2, 2016.

WHEREFORE, Plaintiffs EQD, LLC and Kent Salveson respectfully demand that, upon a final determination by this Court, judgment be entered in its favor as follows:

On Count I of the Complaint:

a.      A determination that that (i) Plaintiff Salveson is the 100% member of EQD, LLC; (ii) that Defendant Yi transferred 100% of EQD, LLC to Plaintiff Salveson on July 2, 2016, (iii) that EQD is not subject to any contracts to sell any of its assets; and (iv) that this judgment be entered *Nunc Pro Tunc* to July 2, 2016; and

b.      an order granting Plaintiffs such other and further relief as the Court deems just and proper.

DATED:      Los Angeles, California
            August 19, 2020                    BALONICK LAW OFFICE, INC.


                                               _____
                                               By; Barney Balonick, Esq.
                                               10100 Santa Monica Blvd
                                               #1700
                                               Los Angeles, California 90067
                                               bhb@balonicklaw.com.
                                               310.703.1755

EXHIBIT A

Page 1

```
 1
 2    SUPREME COURT OF THE STATE NEW YORK
 3    COUNTY OF NEW YORK
 4    Index No.:  158976/2019
 5    ---------------------------------------------x
 6    KENT SALVESON,
 7
 8                              Plaintiff(s),
 9
10            -against-
11
12    EQD, LLC, STEVEN Y. WOO, et al.,
13
14                              Defendant(s).
      ---------------------------------------------x
15    360 Lexington Avenue, 13th Floor
16    New York, New York
17    March 6, 2020
18    10:20 a.m.
19
20        EXAMINATION BEFORE TRIAL OF SUNG YI, a
21    non-party witness, held at the above-mentioned time
22    and place before ANNMARIE OAKLEY, a Notary Public of
23    the State of New York.
24
25
```

Page 2

1

2

3                    A P P E A R A N C E S

4

GANFER SHORE LEEDS & ZAUDERER, LLP

5   Attorneys for Plaintiff

                229 Seventh Street-Suite 200

6                Garden City, NY 11530

7   BY:        DAWN M. WILSON, ESQ.

8

9   Also present:  Kent Salveson, Esq.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1
 2   S U N G   Y I, having first been duly sworn by a
 3   Notary Public of the State of New York, was examined
 4   and testified as follows:
 5   EXAMINATION BY MS. WILSON:
 6        Q    Would you state your name for the record,
 7   please.
 8        A    Sung Yi.
 9        Q    Would you state your address for the
10   record, please.
11        A.   1783 Deerwood Drive, Fullerton, California
12   92833.
13        Q    Good morning, Mr. Yi.
14        A    Good morning.
15             MS. WILSON:  I'm going to ask the court
16        reporter to mark this as Plaintiff's Exhibit 1.
17             (Notice of Deposition was
18             marked as Plaintiff's Exhibit
19             1 for identification.)
20        Q    Time a look at this.  This is a Notice of
21   Deposition dated January 17, 2020, for the
22   deposition of Sung Yi at the office of Ganfer Shore
23   Leeds & Zuaderer, LLP on March 6, 2020 at 10 a.m.
24   and the notice was sent to EQD, LLC, Steven Y. Woo,
25   Jo-Lynn Woo (phonetic) and Janet Nina Escobar.
```

1

2    (phonetic) Take a look at that.  Is that the Notice

3    of Deposition pursuant to which you have appeared

4    here today?

5        A    Yes.

6        Q    You can put that aside.  All right.  Mr.

7    Yi, what is your employment?

8        A    I'm a CFO for ViewSonic Corporation.

9        Q    Can you spell that.

10       A    V-i-e-w-s-o-n-i-c Corp.

11       Q    And how long have you had that position?

12       A    I've had the CFO position for 12 years

13   now.

14       Q    Can you give me a brief summary of your

15   educational history?

16       A    Okay.  I have a bachelors degree in

17   accounting from USC and I have a masters in business

18   MBA from Loyola Marymount University.

19       Q    When did you obtain those degrees.

20       A    I received my bachelors degree in 1989.  I

21   received my MBA 1999.

22       Q    And prior to your current employment did

23   you have other executive level positions at

24   companies?

25       A    I was the CFO for New Egg Corporation as

Page 5

1                          S. YI

2    well and before that I worked in public accounting

3    and I as worked a manager for UCAL Oil.  *UNOCAL*

4        Q    Do you have any licenses?

5        A    I'm a CPA.

6             MS. WILSON:  I'm going to ask the court

7        reporter to mark this as Plaintiff's Exhibit 2.

8             (Declaration of Sung Yi was

9             marked as Plaintiff's Exhibit

10            1 for identification.)

11       Q    Before we get to that, can you tell me

12   what your jobs as CFO entails.

13       A    Our company is a little different.  As a

14   CFO I do more than just financial.  I'm in charge of

15   all of the operations besides sale and marketing.

16   I'm in charge of the financial runnings of the

17   company throughout the globe.  I'm in charge of all

18   our legal affairs.  I'm in charge of our HR affairs

19   and I'm also in charge of our IT and all of our

20   logistics worldwide.

21       Q    You said worldwide, what is the scope of

22   your company?

23       A    So we're about a billion dollar revenue

24   company and we have operations in Europe, in Asia.

25   Pacific including China and also North America.

Page 6

1                          S. YI

2       Q     And what is the business of your company?

3       A     We sell monitors, projectors and large sfm

4   screen displays.

5       Q     All right.  I'm going t hand you what the

6   court reporter has marked as Plaintiff's Exhibit 2,

7   and to describe to the court reporter while you're

8   reviewing it, Exhibit 2, is labeled, "Declaration of

9   Sung Yi."

10      A     Okay.

11      Q     And it is signed on page 7 of the document

12  although the document is undated.  Do you recognize

13  this document Mr. Yi?

14      A     Yes, I do.

15      Q     Did you prepare this document?

16      A     Yes.

17      Q     Is that your signature on the last page?

18      A     Yes, it is.

19      Q     And approximately when did you prepare

20  this document?

21      A     You know what, I can't exactly remember

22  the date that I did prepare this document.  It's

23  been a little bit.

24      Q     And why did you prepare this document?  It

25  is dated.  My bad.

Page 7

```
 1                         S. YI

 2       A     It is dated.

 3       Q     The document is dated.  It says it's

 4  prepared on this date, December 31, 2018.  Does that

 5  refresh your recollection?

 6       A     That does.  So there's a date, yes.

 7       Q     Why did you prepare this document?

 8       A     I was asked by Kent Salveson.  There was a

 9  litigation between Kent and Steve and I prepared

10  this for Kent at the request of Kent.

11       Q     You said "Steve" Steve who?

12       A     Steve Woo.

13       Q     You can put that aside for a moment.

14  We'll come back to it and if you need to look at

15  that to refresh your recollection let me know and

16  we'll take a moment to do that.  There's a lot of

17  dates involved in this.  You mentioned Mr. Steve

18  Woo.  What is your relationship with Mr. Woo?

19       A     I have known Steve Woo since about 2006,

20  so going on 14- 15 years now.  I met him when he

21  started at ViewSonic Corporation.  So we were

22  coworkers and that's how we became friends and so I

23  have known him since then.

24       Q     What is the nature of your relationship

25  today?
```

*STEVE AND I ARE STILL Page 8*
*FRIENDS, BUT WE DON'T SPEAK*
*AS OFTEN AS WE USED?*
*IN THE*
*PAST.*

S. YI

1

2      A      ~~We really don't have a relationship today~~.

3    I haven't spoken to him -- well, regarding cases he

4    would contact me once in a while but in terms of

5    normal contact it's been probably four years since

6    we really had communication.

7      Q      When did he leave ViewSonic?

8      A      It was around 2008.

9      Q      Where did he go?

10     A      He started his own company.

11     Q      Do you recall the name of that company?

12     A      EQD.

13     Q      EQD Corporation?

14     A      Correct.

15     Q      What did EQD Corporation do?

16     A      Basically the same as ViewSonic.  He

17    utilized some of the contacts that it had with

18    ViewSonic and he sold mainly computer monitors.

19     Q      Computer monitors?

20     A      Yes.  He sourced computer monitors from

21    some of the same vendors that ViewSonic used and he

22    sold them to resellers in the U.S.

23     Q      And you said he started this company, what

24    was his role?  He was the CEO?

25     A      He was the CEO.

Page 9

1                         S. YI

2        Q    Did he have employees?

3        A    I don't believe he had any employees.   I

4   believe he was working by himself.

5        Q    Did you have any role in EQD Corporation?

6        A    No, I did not.

7        Q    So you were never an employee?

8        A    No.

9        Q    You were never a director?

10       A    No.

11       Q    Were you every an executive?

12       A    No.

13       Q    Were you an investor?

14       A    No.

15       Q    Were you a lender?

16       A    I did provide a guarantee for EQD on

17  behalf of Steve.

18       Q    We're going to talk about that in a

19  second.   Again, you can look at your declaration.

20  You said you provided a guarantee, can you tell me a

21  little more about that.

22       A    In the summer of, I believe, the summer

23  other '14 sometime around July, I believe, I

24  remember he asked me a few times to provide a

25  guarantee as he was needing to get some inventory

Page 10

1                          S. YI
2    and didn't have the funds to fill this big order.
3        Q    Let me just pause you there.  This was
4    July 2014?
5        A    Yes.
6        Q    You said he needed to pay for inventory,
7    that was inventory for EQD Corporation?
8        A    Correct.
9        Q    And you said it was because he had a large
10   order that he was attempting to fill.
11       A    And he didn't have the cash flow to fill
12   that order.
13       Q    Where was the loan coming from?
14       A    I can't remember.  It was bank name, PMB
15   is the abbreviation of the bank.
16            MS. WILSON:  Off-the-record.
17            (A discussion was held
18            off-the-record.)
19            (Promissory Note and
20            Commercial Guarantees were
21            marked as Plaintiff's Exhibit
22            3 for identification.)
23       Q    I'm handing you what's been marked as
24   Plaintiff's Exhibit 3, which is a couple of
25   documents, a Promissory Note and two Commercial

1                             S. YI

2    Guarantees.   Take a look at Exhibit 3.

3          A     Okay.

4          Q     Who is the borrower on Exhibit number 3?

5          A     EQD Corporation.

6          Q     And who is the lender?

7          A     Pacific Mercantile Bank.

8          Q     I note that in Exhibit 2, which is your

9    declaration, it says, Pacific National Bank Loan

10   Guarantee.  Does Exhibit 3 refresh you recollection

11   that the lender was actually Pacific Mercantile

12   Bank?

13         A     Yes, it was.  That was the bank.

14         Q     So returning to this.  Is it correct that

15   you agreed to be a guarantor of the Pacific

16   Mercantile Bank loan?

17         A     Yes, I did.

18         Q     And what did that entail?  What were you

19   agreeing to do?

20         A     Basically if Steve defaulted I would

21   guarantee payment of the loan.

22         Q     Did Mr. Woo also sign a guarantee?

23         A     I believe he did.

24         Q     To refresh your recollection if you flip

25   through to the third from the last page you see the

Page 12

1                         S. YI

2     commercial guarantee from Steve Woo.

3          A     Okay.

4          Q     What was the amount of the loan?

5          A     250,000.

6          Q     And were you guaranteeing the entire

7     250,000.

8          A     Yes, I was.

9          Q     What was your incentive to do that?

10         A     There was no incentive.  I was helping out

11    a friend that asked me a couple of times to do that.

12         Q     Did you know what happened to the funds

13    that received from this loan?

14         A     No, I don't.  No.

15         Q     Did you know if Mr. Woo used them to

16    acquire the inventory?

17         A     I don't know without look at his

18    accounting records.

19         Q     Did Mr. Woo ever give you an accounting of

20    what happened with these funds?

21         A     No.

22         Q     According to your declaration that we

23    looked at before Mr. Woo and/or EQD Corporation

24    defaulted on the loan; is that correct?

25         A     Yes.

1                          S. YI

2      Q     Did you know why he defaulted?

3      A     I don't know why but my belief was that

4   the business was not doing well and he was not able

5   to pay back the $250,000 loan.

6      Q     What happened next with regard to EQD

7   Corporation and its default on this loan?

8      A     After the default I was notified that

9   Steve Woo filed bankruptcy.

10     Q     And you say Steve Woo do you mean EQD

11  Corporation?

12     A     Yes.

13     Q     What happened with the lender Pacific

14  Mercantile Bank?

15     A     After the default I think it was December

16  of that same year, 2014, the bank actually filed a

17  legal suit against both Steve Woo and myself and I

18  was served.  I wasn't actually in the country and my

19  wife sent a photo of the Complaint to me and I was

20  in shock.

21     Q     Where was this lawsuit filed?

22     A     In Orange County, California, Santa Ana

23  Court I believe.

24     Q     Did you answer the Complaint?

25     A     Yes.  I actually had talked with my friend

Page 14

1                        S. YI

2    Kent Salveson and answered the Complaint.

3        Q    Before we get back to that Complaint,

4    since you brought up Mr. Salveson let's talk about

5    him.  What is your relationship with Kent Salveson?

6        A    Currently Kent and I are ~~friends~~ BUSINESS ASSOCIATES but at

7    that time it was the first time I met Kent.

8    Actually Steve Woo brought Kent to the meeting to

9    help me in responding to the bank.  That's how we

10   met.

11       Q    So you met him through Mr. Woo.  What is

12   Mr. Salveson's profession?

13       A    He's a lawyer.

14       Q    Did you retain him as a lawyer?

15       A    At that time, yes.

16       Q    Have you ever heard of a company called

17   EQD, LLC?

18       A    I have heard of it.

19       Q    What is that company to your knowledge?

20       A    It was a separate holding company as far

21   as I know.

22       Q    Did you have any role in EQD, LLC?  We're

23   talking about in 2014?

24       A    In 2014, no.

25       Q    You didn't found the company.

Page 15

1                          S. YI

2      A    No.

3      Q    And you weren't an original member?

4      A    No.

5      Q    Were you able to resolve or come to a

6  resolution with Pacific Mercantile Bank following

7  the lawsuit?

8      A    Yes.

9      Q    What was in that resolution?

10     A    I had borrowed some funds and basically

11 paid off, the total amount ended up in being 321K

12 and paid off the bank.

13          MS. WILSON:  Off-the-record.

14          (A discussion was held

15          off-the-record.)

16          MS. WILSON:  Bank on-the-record.  Mr. Yi,

17     looking at page three of your declaration,

18     which is Exhibit 2, in the center of the page

19     it refers to the title, it says, "Pacific

20     National Bank Settlement."

21     A    Yes.

22     Q    Does that refer to Pacific Mercantile

23 Bank?

24     A    Yes, it should be.

25     Q    Does this refresh your recollection there

Page 16

1                          S. YI

2    was a settlement with Pacific Mercantile Bank?

3         A    Yes.

4              (Settlement Agreement was

5              marked as Plaintiff's Exhibit

6              4 for identification.)

7         Q    I'm going to hand you Plaintiff's Exhibit

8    4.  Take a look at that.  Okay.  Is this the

9    settlement agreement with Pacific Mercantile Bank?

10        A    Yes.

11        Q    Looking back at your Declaration again,

12   we'll get back to the payment schedule in a second.

13   Paragraph 18 of your Declaration refers to what is

14   called "The condo at 450 West 17th Street, New York,

15   New York."  Do you see that?

16        A    Yes.

17        Q    Are you familiar with the condo referenced

18   here?

19        A    Yes, I'm familiar.

20        Q    Who owned that condo?

21        A    Steve Woo and his wife.

22        Q    And referenced here there was a transfer

23   of the condo.  Where was the condo transferred to?

24        A    Transferred to EQD, to me.

25        Q    No.  No.  No.  You're jumping ahead in

Page 17

```
 1                         S. YI
 2   time.  Look at paragraph 19, please.
 3        A     To EQD, LLC.
 4        Q     And that's a different entity from EQD
 5   Corporation; correct?
 6        A     Correct.
 7        Q     Looking back at Exhibit number 4 if you
 8   turn, starting at the bottom of the page one, it
 9   says paragraph 2, "Settlement Payment" and if you
10   flip the page there's a schedule of payments.
11        A     Yes.
12        Q     And who is obligated to make these
13   payments?
14        A     It was both myself and Steve but I ended
15   up making the payments.
16        Q     Was this Settlement Agreement then
17   defaulted on?
18        A     No, it was not.
19             MS. WILSON:  Okay.  Let's go
20        off-the-record.
21             (A discussion was held
22             off-the-record.)
23             MS. WILSON:  Let's go back on-the-record.
24        Q     Mr. Yi, we were talking about the
25   settlement with Pacific Mercantile Bank which
```

Page 18

1                         S. YI

2   according to the schedule on page two required a

3   number of payments to be made on specific dates.  Do

4   you see that?

5         A    Yes.

6         Q    Were both Mr. Woo and you obligated to

7   make these payments?

8         A    Yes.

9         Q    Did Mr. Woo make any of the payments?

10        A    No.

11        Q    He was not able to?

12        A    He was not able to make any of the

13  payments.

14        Q    Did you make any of the payments?

15        A    Yes, I did.

16        Q    How did you obtain the funds to make these

17  payments?

18        A    I obtained funds from a close friend of

19  mine.

20        Q    What is the name of that close friend?

21        A    Can you give me a second.  I'm trying to

22  remember who I borrowed money from.

23        Q    Well stay on-the-record.  I understand

24  you're having difficulty remembering the name now.

25  Was it Mr. Salveson at this point in time?

Page 19

1                              S. YI

2        A     No, not yet.

3        Q     Did there come a time where Mr. Woo asked

4    you for additional money to help pay off these

5    debts?

6        A     No.

7        Q     Did there come a time that you demanded

8    from Mr. Woo some sort of compensation in exchange

9    for making these payments that he couldn't make?

10       A     Yes.

11       Q     What was that?

12       A     I asked for ownership or interest in the

13   condo in New York.

14       Q     How did you obtain that interest?

15       A     Basically I worked with -- we worked

16   together with Mr. Kent Salveson to transfer the

17   interest of the condo to me.

18       Q     And was the condo at that time owned by

19   EQD, LLC?

20       A     Yes, it was.  I remember the name by the

21   way.  Lee Chang, C-h-a-n-g.

22             MS. WILSON:  Off-the record.

23             (A discussion was held

24             off-the-record.)

25             MS. WILSON:  Back on.

Page 20

1                          S. YI

2       Q     Did Mr. Woo agree to give you an interest

3    in the condo by selling you EQD, LLC?

4       A     Yes.

5       Q     And how did this agreement come about?

6       A     We had a meeting, Mr. Salveson, Mr. Woo

7    and myself and we came up with that solution

8    together.

9       Q     What was the solution?

10      A     The solution was in order to help to pay

11   my friend back I was going to take ownership of

12   EQD/condo and then I was going to get a loan, borrow

13   money off an interest in the condo and basically pay

14   off the loan from my friend.

15            (Membership Certificate was

16            marked as Plaintiff's Exhibit

17            5 for identification.)

18      Q     Mr. Yi, I'm handing you Plaintiff's

19   Exhibit 5, which is labeled, "LLC Membership

20   Certificate" dated -- it doesn't seem to be dated.

21   Are you a signatory to this document?

22      A     Yes, I am.

23      Q     Is Mr. Woo a signatory to this document?

24      A     Yes.

25      Q     Do you know who the witness's signature

Page 21

```
 1                              S. YI
 2   is?
 3         A    Mr. Salveson.
 4         Q    What does this certificate represent?
 5         A    Transfer of EQD, LLC to me.
 6         Q    From Steve Woo to you?
 7         A    Yes.
 8         Q    And what percentage interest?
 9         A    100%.
10         Q    In the connection with the transfer of
11   EQD, LLC to you was this in any way a loan to
12   Mr. Woo?
13         A    No, it was not.
14         Q    Was this a financing or some kind of
15   arrangement for Mr. Woo?
16         A    No.
17         Q    Was it a financing for EQD Corporation?
18         A    No.
19         Q    Was this transfer to you contingent on
20   anything else?
21         A    No contingencies.
22         Q    Was it conditional?
23         A    No.
24         Q    Were there any post-closing conditions on
25   this transfer of EQD, LLC from Mr. Woo to you?
```

Page 22

1                          S. YI

2      A     No.

3      Q     Was it your understanding upon this

4  transfer that you were the 100% owner of EQD, LLC?

5      A     Yes.

6      Q     Did Mr. Woo continue to have any interest

7  in EQD, LLC at this time?

8      A     No.

9      Q     What was the asset of EQD, LLC at this

10  time?

11      A     I don't know the exact address but it was

12  a condominium in New York City.

13      Q     Would that condominium be at 450 West 17th

14  Street?

15      A     Correct.

16      Q     And to your recollection was the name of

17  that building the Caledonian?

18      A     Yes.

19                 (One-page document was marked

20                 as Plaintiff's Exhibit 6 for

21                 identification.)

22      Q     I'm handing you Plaintiff's Exhibit 6.  If

23  you can take a look at that this document.  This

24  document is from the Secretary of State of Nevada.

25  It is labeled, "Certificate of Resignation of

Page 23

1                          S. YI
2    Officer, Director, Manager, Member, Partner, Trustee
3    or Subscriber."  What is the company referred to in
4    this Secretary of State document?
5         A    EQD, LLC.
6         Q    Who is the person that is resigning?
7         A    Steve Woo.
8         Q    And is that Mr. Woo's signature on the
9    authorized signature line?
10        A    Yes.
11             (One-page document was marked
12             as Plaintiff's Exhibit 7 for
13             identification.)
14        Q    I'm handing you Exhibit 7, which is
15   labeled, "Initial Annual List of Officers Directors
16   and State Business License Application of EQD, LLC."
17   and if you look at the bottom line is this your
18   signature?
19        A    Yes.
20        Q    What's the date of this document?
21        A    September 28, 2015.
22        Q    What's your title according to this
23   document?
24        A    Managing member.
25        Q    Does this document now reflect that you're

Page 24

1                           S. YI

2    the managing member of EQD, LLC as of September 28,

3    2015?

4        A    Yes.

5        Q    Following your becoming the sole member of

6    EQD, LLC were you able to get any income from the

7    condo?

8        A    No, I was not.

9        Q    Why not?

10       A    There was no renter in the condo and Steve

11   did not have the funds.  I wasn't able to generate

12   any income from the condo or get any money from

13   Steve.

14       Q    And you had a loan from Mr. Chang?

15       A    Yes, that I was still paying interest on.

16       Q    Did there come a time where you sought to

17   resolve that situation?

18       A    Yes.  I was looking for an alternative and

19   talked to Steve and Kent on ways to come up with

20   income to pay back that loan.

21       Q    What did you decide to do?

22       A    I was going to use the loan and Kent had

23   ideas and I was asking Kent if we could get a note

24   on using the condo to basically put out a note and

25   so looked at getting that.

Page 25

1                            S. YI

2       Q      Did there come a time that you transferred

3   EQD, LLC to someone else?

4       A      Yes.

5       Q      And who was that?

6       A      Mr. Kent Salveson.

7       Q      How did that come about?

8       A      I was looking for a loan against the condo

9   Kent actually volunteered to take over the condo and

10  pay back the money that's owed to my friend.

11      Q      And how much money did he agree to pay for

12  the EQD, LLC and the condo?

13      A      The full amount that I owed to my friend

14  which was approximately 321K.

15      Q      Was there any additional funds, if you

16  look at page 6 of your Declaration to refresh your

17  recollection.

18      A      I knew there were additional cost incurred

19  with related to the condo but I was told it was

20  approximately $100,000.

21      Q      And Mr. Salveson paid those off as well?

22      A      Yes.

23      Q      And to be clear, Mr. Salveson paid off the

24  $321,000 that you borrowed from your friend?

25      A      Yes, correct.

1                          S. YI

2        Q     And in exchange what did you agree to give

3   Mr. Salveson?

4        A     Interest in the condo.

5        Q     Via?

6        A     EQD, LLC.

7              (Membership Certificate was

8              marked as Plaintiff's Exhibit

9              8 for identification.)

10       Q     I'm handing you a document marked Exhibit

11  8, an LLC Membership Certificate for EQD, LLC and

12  what did you do pursuant to this document?

13       A     Basically I sold the interest of EQD, LLC

14  to Mr. Salveson.

15       Q     Is that your signature "Sung Yi, member"

16  on two places on the document?

17       A     Yes, it is.

18       Q     What is the good and valuable

19  consideration in payment for the transfer?

20       A     Payment of the $321,000.

21       Q     And it knowledges that you received that

22  payment in the benefit thereof.

23       A     Yes.

24       Q     And is this Mr. Salveson's signature as

25  the buyer?

Page 27

1                      S. YI

2        A    Yes, it is.

3             (One-page document was marked

4             as Plaintiff's Exhibit 9 for

5             identification.)

6        Q    I'm handing you Exhibit 9, which is also

7    labeled "LLC Membership Certificate for EQD, LLC." I

8    will note that document, and let me know if you

9    agree with me, is identical to Exhibit 8 except this

10   one has been dated.

11       A    Yes.

12       Q    Is this your signature on this document?

13       A    Yes, it is.

14       Q    Pursuant to this did you transfer EQD, LLC

15   to Mr. Salveson on July 2, 2016?

16       A    Yes.

17       Q    And you recall signing and dating this

18   document?

19       A    Yes.

20       Q    Was Mr. Woo aware of your transfer of EQD,

21   LLC to Mr. Salveson?

22       A    Yes.  These documents came about after a

23   meeting the three of us had and this was actually

24   discussed in the meeting.

25       Q    When you say the three you mean you

Page 28

1                          S. YI

2    Mr. Woo and Mr. Salveson?

3         A    Yes.

4         Q    Was it your intention for Mr. Woo to have

5    any continuing interest in EQD, LLC after that

6    transaction?

7         A    No.

8         Q    What about his interest in the condo?

9         A    No.

10        Q    Did you intends for Mr. woo's wife to have

11   any continuing interest in the condo?

12        A    No.

13        Q    Was it your understanding that following

14   this transfer to Mr. Salveson that Mr. Salveson was

15   the sole member of EQD, LLC?

16        A    Yes.

17        Q    Was it also your understanding that

18   following this transfer Mr. Salveson was the only

19   person with an interest in the condo?

20        A    Yes.

21             (Answer to Interrogatories was

22             marked as Plaintiff's Exhibit

23             10 for identification.)

24             MS. WILSON:  Let's go off-the-record.

25             (A discussion was held

Page 29

1                           S. YI

2             off-the-record.)

3       Q     I'm handing you Plaintiff's Exhibit 10,

4  which is the Answer of Steve Woo and Jo-Lynn Ewing

5  in this action.   Just to clarify, have you seen this

6  document before?

7       A     No, I don't think.

8       Q     So you haven't seen this before?

9       A     No.

10      Q     I'm going to ask you to turn to page 18 of

11 37.

12      A     Okay.

13      Q     Paragraph 55 of this Answer and

14 Counterclaims says that, "Counter defendant,

15 Salveson during this timeframe had Sung Yi

16 unwittingly execute certain documents that would

17 transfer ownership of EQD, LLC to Clearson and/or

18 Salveson."  Do you see that language?

19      A     Yes.

20      Q     Do you agree with that allegation that you

21 unwittingly executed certain documents?

22      A     No, I don't agree.  Before this I never

23 actually seen the word unwittingly used but I think

24 I understand what it means.

25      Q     What do you understand it to mean?

Page 30

1                              S. YI

2         A     Someone that's not knowledge if this type

3    of agreement.  I know that at the time we had

4    discussed this transaction and so I did know what

5    the document was.

6         Q     And when you say you are know what the

7    document was, you understood that you were

8    transferring 100% interest in EQD, LLC and its

9    assets to Mr. Salveson?

10        A     Yes.

11        Q     And Mr. Woo was present when this

12   transaction was discussed?

13        A     Yes.

14        Q     And is it your belief that he understood

15   that was happening as well?

16        A     Yes.

17        Q     Was that transaction conditional in any

18   way based on your understanding?

19        A     No.

20        Q     Was there any post-closing conditions?

21        A     No.

22        Q     Did Mr. Woo ask you if the documents

23   transferring the interest in EQD, LLC were okay?

24        A     Yes.  He had sent me an email asking me

25   because he felt that he didn't understand contracts

Page 31

1                              S. YI

2    very well and he thought I understood them better so

3    he sent me an email and he asked me to review the

4    documents and I reviewed them and I felt they were

5    reasonable.

6         Q    Did you understand this transaction where

7    you transferred EQD, LLC to Mr. Salveson to be a

8    loan of any kind?

9         A    No.

10        Q    So it was not a loan to Mr. Woo?

11        A    No.

12        Q    And in your understanding did Mr. Woo or

13   his wife retain any interest in EQD, LLC?

14        A    I don't believe they had any ownership.

15             MS. WILSON:  Off-the-record.

16             (A discussion was held

17             off-the-record.)

18             MS. WILSON:  Back on.

19        Q    Same document, you're going to turn to

20   page 23 of 37.

21        A    Okay.

22        Q    If you can read paragraph 71 to yourself.

23             (Witness complying with

24             request.)

25        A    Okay.

Page 32

1                          S. YI

2       Q    Paragraph 71 refers to a meeting at Panera

3   Restaurant.

4       A    Yes.

5       Q    Is that the meeting you described before

6   between you, Mr. Woo and Mr. Salveson?

7       A    Yes.

8       Q    This paragraph 71 alleges that "Salveson

9   placed numerous documents in front of Sung Yi to

10  sign."  Do you see that?

11      A    Yes.

12      Q    Did you understand the documents that were

13  placed in front of you at that time?

14      A    Yes.

15      Q    What did you understand those documents

16  were going to do?

17      A    They were going to transfer the ownership

18  of EQD LLC from myself to Ken Salveson.

19      Q    And if you can read paragraph 72 to

20  yourself.

21           (Witness complying with

22           request.)

23      A    Yes.

24      Q    Paragraph 72 alleges that Sung Yi had no

25  idea he was signing documents that would improperly

1                           S. YI

2    transfer legal ownership of EQD, LLC to Clearson."

3    Do you see that?

4         A    Yes.

5         Q    Do you agree with that allegation?

6         A    No, I don't.

7         Q    Did you understand what you were signing?

8         A    Yes, I did.

9         Q    What did you understand the papers that

10   you were signing were going to do?

11        A    Transfers EQD, LLC to Mr. Kent Salveson.

12             MS. WILSON:  Off-the-record.

13             (A discussion was held

14             off-the-record.)

15             MS. WILSON:  Back on.

16        Q    Based on your attendance and participation

17   at this meeting at Panera Restaurant was it your

18   belief that you understood that you were

19   transferring EQD, LLC to Mr. Salveson?

20        A    Yes.  I felt he understood the

21   transaction.  The three of us discussed the details

22   of the transaction in the meeting and agreed.

23             (A break was taken.)

24        Q    Mr. Yi, in discussing and planning these

25   transactions regarding the transfer of EQD, LLC were

Page 34

1                             S. YI
2    there any secret meetings between you and
3    Mr. Salveson?
4         A     No.   There were no meetings on those
5    topics with just the two of us.
6         Q     Mr. Woo was involved in all those
7    conversations?
8         A     Yes.
9         Q     And in those meetings or conversations do
10   you feel that Mr. Salveson disclosed everything that
11   was happening regarding the transfer of EQD, LLC?
12        A     Yes.
13        Q     Looking back do you feel that any
14   information was withheld from you?
15        A     No.
16        Q     In your opinion based on your observation
17   of the participants in these meetings did Mr. Woo
18   understand that EQD, LLC was being transferred to
19   Mr. Kent Salveson?
20        A     In my opinion I felt that he understood
21   the transaction.
22        Q     Did you and Mr. Woo have any conversations
23   regarding these transactions among yourself that
24   didn't include Mr. Salveson?
25        A     No.  We agreed at the time that if we

Page 35

```
 1                          S. YI
 2     discussed this we would all meet together so that no
 3     one felt they didn't understand the transaction.   We
 4     made it a point to meet together at all times.
 5                (TIME NOTED:  11:57 a.m.)
 6
 7
 8
 9
10
11
12
13
14
15                                         SUNG YI
16
17     Subscribed and sworn to before me
18     this  24  day of  March           , 20 20 .
19
20     _____
21              NOTARY PUBLIC
22
23                              SEE CALIFORNIA
24                              JURAT ATTACHED
25                              DATE 03/24/ INITL
                                     2020
```

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate
is attached, and not the truthfulness, accuracy, or
validity of that document.

State of California
County of Orange

Subscribed and sworn to (or affirmed) before me on this 24
day of March , 20 20 , by Sung Yi

proved to me on the basis of satisfactory evidence to be the
person(s) who appeared before me.

TERESA D. LEWIS
COMM. # 2257499
NOTARY PUBLIC - CALIFORNIA
ORANGE COUNTY
MY COMM. EXP. OCT. 3, 2022

(Seal)                              Signature

Page 36

```
 1                              S. YI
 2                         I N D E X
 3    EXAMINATION BY                          PAGE
 4    Ms. Wilson                               3
 5
 6
 7                         E X H I B I T S
 8    EXHIBIT           DESCRIPTION            PAGE
 9    Plaintiff's 1   Deposition Notice         3
10    Plaintiff's 2   Declaration               5
11    Plaintiff's 3   Promissory Note and
12                    Commercial Guarantees    10
13    Plaintiff's 4   Settlement Agreement     16
14    Plaintiff's 5   Membership Certificate   20
15    Plaintiff's 6   1-pg doc                 22
16    Plaintiff's 7   1-pg doc                 23
17    Plaintiff's 8   Membership Certificate   26
18    Plaintiff's 9   1-pg doc                 27
19    Plaintiff's 10  Answer                   28
20    Exhibits retained by COUNSEL.
21
22
23
24
25
```

1                          S. YI
2                    C E R T I F I C A T E
3
4          I, ANNMARIE OAKLEY, a Shorthand Reporter
5   and Notary Public within and for the State of
6   New York, do hereby certify:
7          THAT SUNG YI, the witness whose deposition
8   is herein before set forth, was duly sworn by me,
9   and that such deposition is a true record of the
10  testimony given by such witness.
11         I further certify that I am not related to
12  any of the parties to this action by blood or by
13  marriage and that I am in no way interested in the
14  outcome of this matter.
15  IN WITNESS THEREOF, I have hereunto set my hand this
16  17th day of March, 2020.
17
18
19         *(signature)*
20
21         ANNMARIE OAKLEY
22
23
24
25

Page 38

```
 1                        S. YI
 2                    ERRATA SHEET
 3    DATE OF DEPOSITION: MARCH 6, 2020
      NAME OF DEPONENT:   SUNG YI
 4
 5    PAGE   LINE(S)        CHANGE        REASON
 6     5  |  3    |_____|  CLARITY
 7     6  |  3    |_____|    "
 8     8  |  2-6  |_____|    "
 9    14  |  6-7  |_____|    "
10    19  |  2 1  |_____|    "
11    ___|_____|_____|
12    ___|_____|_____|
13    ___|_____|_____|
14    ___|_____|_____|
15    ___|_____|_____|
16    ___|_____|_____|
17
18
19    _____
                        SUNG YI
20
      SUBSCRIBED AND SWORN TO BEFORE ME
21    THIS _____ DAY OF _____, 20____.
22
23
24    _____
             NOTARY PUBLIC
25
```

[& - bank]                                                                 Page 1

**&**

**&**   2:4 3:23

**1**

**1**   3:16,19 5:10
  36:9,15,16,18
**10**   3:23 28:23 29:3
  36:12,19
**100**   21:9 22:4 30:8
**100,000**   25:20
**10:20**   1:18
**11530**   2:6
**11:57**   35:5
**12**   4:12
**12258**   37:19
**13th**   1:15
**14**   7:20 9:23
**15**   7:20
**158976/2019**   1:4
**16**   36:13
**17**   3:21
**1783**   3:11
**17th**   16:14 22:13
  37:16
**18**   16:13 29:10
**19**   17:2
**1989**   4:20
**1999**   4:21

**2**

**2**   5:7 6:6,8 11:8
  15:18 17:9 27:15
  36:10
**20**   35:18 36:14
  38:21
**200**   2:5
**2006**   7:19
**2008**   8:8
**2014**   10:4 13:16
  14:23,24
**2015**   23:21 24:3

**2016**   27:15
**2018**   7:4
**2020**   1:17 3:21,23
  37:16 38:3
**22**   36:15
**229**   2:5
**23**   31:20 36:16
**250,000**   12:5,7
  13:5
**26**   36:17
**27**   36:18
**28**   23:21 24:2
  36:19

**3**

**3**   10:22,24 11:2,4
  11:10 36:4,9,11
**31**   7:4
**321,000**   25:24
  26:20
**321k**   15:11 25:14
**360**   1:15
**37**   29:11 31:20

**4**

**4**   16:6,8 17:7
  36:13
**450**   16:14 22:13

**5**

**5**   20:17,19 36:10
  36:14
**55**   29:13

**6**

**6**   1:17 3:23 22:20
  22:22 25:16 36:15
  38:3

**7**

**7**   6:11 23:12,14
  36:16
**71**   31:22 32:2,8

**72**   32:19,24

**8**

**8**   26:9,11 27:9
  36:17

**9**

**9**   27:4,6 36:18
**92833**   3:12

**a**

**a.m.**   1:18 3:23
  35:5
**abbreviation**
  10:15
**able**   13:4 15:5
  18:11,12 24:6,11
**accounting**   4:17
  5:2 12:18,19
**acquire**   12:16
**action**   29:5 37:12
**additional**   19:4
  25:15,18
**address**   3:9 22:11
**affairs**   5:18,18
**agree**   20:2 25:11
  26:2 27:9 29:20
  29:22 33:5
**agreed**   11:15
  33:22 34:25
**agreeing**   11:19
**agreement**   16:4,9
  17:16 20:5 30:3
  36:13
**ahead**   16:25
**al**   1:12
**allegation**   29:20
  33:5
**alleges**   32:8,24
**alternative**   24:18
**america**   5:25
**amount**   12:4
  15:11 25:13

**ana**   13:22
**annmarie**   1:22
  37:4,21
**annual**   23:15
**answer**   13:24
  28:21 29:4,13
  36:19
**answered**   14:2
**appeared**   4:3
**application**   23:16
**approximately**
  6:19 25:14,20
**arm**   6:3
**arrangement**
  21:15
**asia**   5:24
**aside**   4:6 7:13
**asked**   7:8 9:24
  12:11 19:3,12
  31:3
**asking**   24:23
  30:24
**asset**   22:9
**assets**   30:9
**attempting**   10:10
**attendance**   33:16
**attorneys**   2:5
**authorized**   23:9
**avenue**   1:15
**aware**   27:20

**b**

**b**   36:7
**bachelors**   4:16,20
**back**   7:14 13:5
  14:3 16:11,12
  17:7,23 19:25
  20:11 24:20 25:10
  31:18 33:15 34:13
**bad**   6:25
**bank**   10:14,15
  11:7,9,12,13,16

13:14,16 14:9
15:6,12,16,20,23
16:2,9 17:25
**bankruptcy** 13:9
**based** 30:18 33:16
34:16
**basically** 8:16
11:20 15:10 19:15
20:13 24:24 26:13
**becoming** 24:5
**behalf** 9:17
**belief** 13:3 30:14
33:18
**believe** 9:3,4,22,23
11:23 13:23 31:14
**benefit** 26:22
**better** 31:2
**big** 10:2
**billion** 5:23
**bit** 6:23
**blood** 37:12
**borrow** 20:12
**borrowed** 15:10
18:22 25:24
**borrower** 11:4
**bottom** 17:8 23:17
**break** 33:23
**brief** 4:14
**brought** 14:4,8
**building** 22:17
**business** 4:17 6:2
13:4 23:16
**buyer** 26:25

**c**

**c** 2:3 4:10 19:21
37:2,2
**caledonian** 22:17
**california** 3:11
13:22
**called** 14:16 16:14

**cases** 8:3
**cash** 10:11
**center** 15:18
**ceo** 8:24,25
**certain** 29:16,21
**certificate** 20:15
20:20 21:4 22:25
26:7,11 27:7
36:14,17
**certify** 37:6,11
**cfo** 4:8,12,25 5:12
5:14
**chang** 19:21 24:14
**change** 38:5
**charge** 5:14,16,17
5:18,19
**china** 5:25
**city** 2:6 22:12
**clarify** 29:5
**clear** 25:23
**clearson** 29:17
33:2
**close** 18:18,20
**closing** 21:24
30:20
**come** 7:14 15:5
19:3,7 20:5 24:16
24:19 25:2,7
**coming** 10:13
**commercial** 10:20
10:25 12:2 36:12
**communication**
8:6
**companies** 4:24
**company** 5:13,17
5:22,24 6:2 8:10
8:11,23 14:16,19
14:20,25 23:3
**compensation**
19:8

**complaint** 13:19
13:24 14:2,3
**complying** 31:23
32:21
**computer** 8:18,19
8:20
**conditional** 21:22
30:17
**conditions** 21:24
30:20
**condo** 16:14,17,20
16:23,23 19:13,17
19:18 20:3,12,13
24:7,10,12,24 25:8
25:9,12,19 26:4
28:8,11,19
**condominium**
22:12,13
**connection** 21:10
**consideration**
26:19
**contact** 8:4,5
**contacts** 8:17
**contingencies**
21:21
**contingent** 21:19
**continue** 22:6
**continuing** 28:5
28:11
**contracts** 30:25
**conversations**
34:7,9,22
**corp** 4:10
**corporation** 4:8
4:25 7:21 8:13,15
9:5 10:7 11:5
12:23 13:7,11
17:5 21:17
**correct** 8:14 10:8
11:14 12:24 17:5
17:6 22:15 25:25

**cost** 25:18
**counsel** 36:20
**counter** 29:14
**counterclaims**
29:14
**country** 13:18
**county** 1:3 13:22
**couple** 10:24
12:11
**court** 1:2 3:15 5:6
6:6,7 13:23
**coworkers** 7:22
**cpa** 5:5
**current** 4:22
**currently** 14:6

**d**

**d** 36:2
**date** 6:22 7:4,6
23:20 38:3
**dated** 3:21 6:25
7:2,3 20:20,20
27:10
**dates** 7:17 18:3
**dating** 27:17
**dawn** 2:7
**day** 35:18 37:16
38:21
**debts** 19:5
**december** 7:4
13:15
**decide** 24:21
**declaration** 5:8
6:8 9:19 11:9
12:22 15:17 16:11
16:13 25:16 36:10
**deerwood** 3:11
**default** 13:7,8,15
**defaulted** 11:20
12:24 13:2 17:17
**defendant** 1:14
29:14

[degree - handing]                                                                    Page 3

| | | | |
|---|---|---|---|
| degree  4:16,20 | duly  3:2 37:8 | examined  3:3 | friends  7:22 14:6 |
| degrees  4:19 | **e** | exchange  19:8 | front  32:9,13 |
| demanded  19:7 | | 26:2 | full  25:13 |
| deponent  38:3 | e  2:3,3 4:10 36:2,7 | execute  29:16 | fullerton  3:11 |
| deposition  3:17,21 | 37:2,2 | executed  29:21 | funds  10:2 12:12 |
| 3:22 4:3 36:9 37:7 | educational  4:15 | executive  4:23 | 12:20 15:10 18:16 |
| 37:9 38:3 | egg  4:25 | 9:11 | 18:18 24:11 25:15 |
| describe  6:7 | email  30:24 31:3 | exhibit  3:16,18 5:7 | further  37:11 |
| described  32:5 | employee  9:7 | 5:9 6:6,8 10:21,24 | **g** |
| description  36:8 | employees  9:2,3 | 11:2,4,8,10 15:18 | |
| details  33:21 | employment  4:7 | 16:5,7 17:7 20:16 | g  3:2 19:21 |
| different  5:13 17:4 | 4:22 | 20:19 22:20,22 | ganfer  2:4 3:22 |
| difficulty  18:24 | ended  15:11 17:14 | 23:12,14 26:8,10 | garden  2:6 |
| director  9:9 23:2 | entail  11:18 | 27:4,6,9 28:22 | generate  24:11 |
| directors  23:15 | entails  5:12 | 29:3 36:8 | getting  24:25 |
| disclosed  34:10 | entire  12:6 | exhibits  36:20 | give  4:14 12:19 |
| discussed  27:24 | entity  17:4 | **f** | 18:21 20:2 26:2 |
| 30:4,12 33:21 | eqd  1:12 3:24 8:12 | | given  37:10 |
| 35:2 | 8:13,15 9:5,16 | f  37:2 | globe  5:17 |
| discussing  33:24 | 10:7 11:5 12:23 | familiar  16:17,19 | go  8:9 17:19,23 |
| discussion  10:17 | 13:6,10 14:17,22 | far  14:20 | 28:24 |
| 15:14 17:21 19:23 | 16:24 17:3,4 | feel  34:10,13 | going  3:15 5:6 6:5 |
| 28:25 31:16 33:13 | 19:19 20:3,12 | felt  30:25 31:4 | 7:20 9:18 16:7 |
| displays  6:4 | 21:5,11,17,25 22:4 | 33:20 34:20 35:3 | 20:11,12 24:22 |
| doc  36:15,16,18 | 22:7,9 23:5,16 | filed  13:9,16,21 | 29:10 31:19 32:16 |
| document  6:11,12 | 24:2,6 25:3,12 | fill  10:2,10,11 | 32:17 33:10 |
| 6:13,15,20,22,24 | 26:6,11,13 27:7,14 | financial  5:14,16 | good  3:13,14 |
| 7:3,7 20:21,23 | 27:20 28:5,15 | financing  21:14,17 | 26:18 |
| 22:19,23,24 23:4 | 29:17 30:8,23 | first  3:2 14:7 | guarantee  9:16,20 |
| 23:11,20,23,25 | 31:7,13 32:18 | flip  11:24 17:10 | 9:25 11:10,21,22 |
| 26:10,12,16 27:3,8 | 33:2,11,19,25 | floor  1:15 | 12:2 |
| 27:12,18 29:6 | 34:11,18 | flow  10:11 | guaranteeing  12:6 |
| 30:5,7 31:19 | errata  38:2 | following  15:6 | guarantees  10:20 |
| documents  10:25 | escobar  3:25 | 24:5 28:13,18 | 11:2 36:12 |
| 27:22 29:16,21 | esq  2:7,9 | follows  3:4 | guarantor  11:15 |
| 30:22 31:4 32:9 | et  1:12 | forth  37:8 | **h** |
| 32:12,15,25 | europe  5:24 | found  14:25 | |
| doing  13:4 | ewing  29:4 | four  8:5 | h  19:21 36:7 |
| dollar  5:23 | exact  22:11 | friend  12:11 13:25 | hand  6:5 16:7 |
| drive  3:11 | exactly  6:21 | 18:18,20 20:11,14 | 37:15 |
| | examination  1:20 | 25:10,13,24 | handing  10:23 |
| | 3:5 36:3 | | 20:18 22:22 23:14 |

[handing - membership]                                                                 Page 4

26:10 27:6 29:3
**happened** 12:12
12:20 13:6,13
**happening** 30:15
34:11
**heard** 14:16,18
**held** 1:21 10:17
15:14 17:21 19:23
28:25 31:16 33:13
**help** 14:9 19:4
20:10
**helping** 12:10
**hereunto** 37:15
**history** 4:15
**holding** 14:20
**hr** 5:18

**i**

**idea** 32:25
**ideas** 24:23
**identical** 27:9
**identification** 3:19
5:10 10:22 16:6
20:17 22:21 23:13
26:9 27:5 28:23
**improperly** 32:25
**incentive** 12:9,10
**include** 34:24
**including** 5:25
**income** 24:6,12,20
**incurred** 25:18
**index** 1:4
**information** 34:14
**initial** 23:15
**intends** 28:10
**intention** 28:4
**interest** 19:12,14
19:17 20:2,13
21:8 22:6 24:15
26:4,13 28:5,8,11
28:19 30:8,23
31:13

**interested** 37:13
**interrogatories**
28:21
**inventory** 9:25
10:6,7 12:16
**investor** 9:13
**involved** 7:17 34:6

**j**

**janet** 3:25
**january** 3:21
**jo** 3:25 29:4
**jobs** 5:12
**july** 9:23 10:4
27:15
**jumping** 16:25

**k**

**ken** 32:18
**kent** 1:6 2:9 7:8,9
7:10,10 14:2,5,6,7
14:8 19:16 24:19
24:22,23 25:6,9
33:11 34:19
**kind** 21:14 31:8
**knew** 25:18
**know** 6:21 7:15
12:12,15,17 13:2,3
14:21 20:25 22:11
27:8 30:3,4,6
**knowledge** 14:19
30:2
**knowledges** 26:21
**known** 7:19,23

**l**

**labeled** 6:8 20:19
22:25 23:15 27:7
**language** 29:18
**large** 6:3 10:9
**lawsuit** 13:21 15:7
**lawyer** 14:13,14

**leave** 8:7
**lee** 19:21
**leeds** 2:4 3:23
**legal** 5:18 13:17
33:2
**lender** 9:15 11:6
11:11 13:13
**level** 4:23
**lexington** 1:15
**license** 23:16
**licenses** 5:4
**line** 23:9,17 38:5
**list** 23:15
**litigation** 7:9
**little** 5:13 6:23
9:21
**llc** 1:12 3:24 14:17
14:22 17:3 19:19
20:3,19 21:5,11,25
22:4,7,9 23:5,16
24:2,6 25:3,12
26:6,11,11,13 27:7
27:7,14,21 28:5,15
29:17 30:8,23
31:7,13 32:18
33:2,11,19,25
34:11,18
**llp** 2:4 3:23
**loan** 10:13 11:9,16
11:21 12:4,13,24
13:5,7 20:12,14
21:11 24:14,20,22
25:8 31:8,10
**logistics** 5:20
**long** 4:11
**look** 3:20 4:2 7:14
9:19 11:2 12:17
16:8 17:2 22:23
23:17 25:16
**looked** 12:23
24:25

**looking** 15:17
16:11 17:7 24:18
25:8 34:13
**lot** 7:16
**loyola** 4:18
**lynn** 3:25 29:4

**m**

**m** 2:7
**making** 17:15 19:9
**manager** 5:3 23:2
**managing** 23:24
24:2
**march** 1:17 3:23
37:16 38:3
**mark** 3:16 5:7
**marked** 3:18 5:9
6:6 10:21,23 16:5
20:16 22:19 23:11
26:8,10 27:3
28:22
**marketing** 5:15
**marriage** 37:13
**marymount** 4:18
**masters** 4:17
**matter** 37:14
**mba** 4:18,21
**mean** 13:10 27:25
29:25
**means** 29:24
**meet** 35:2,4
**meeting** 14:8 20:6
27:23,24 32:2,5
33:17,22
**meetings** 34:2,4,9
34:17
**member** 15:3 23:2
23:24 24:2,5
26:15 28:15
**membership**
20:15,19 26:7,11
27:7 36:14,17

[mentioned - read]                                                                                          Page 5

| | | 32:17 33:2 | photo  13:19 |
|---|---|---|---|
| mentioned  1:21 | 36:11 | **p** | place  1:22 |
| 7:17 | noted  35:5 | | placed  32:9,13 |
| mercantile  11:7 | notice  3:17,20,24 | p  2:3,3 | places  26:16 |
| 11:11,16 13:14 | 4:2 36:9 | pacific  5:25 11:7,9 | plaintiff  1:8 2:5 |
| 15:6,22 16:2,9 | notified  13:8 | 11:11,15 13:13 | plaintiff's  3:16,18 |
| 17:25 | number  11:4 17:7 | 15:6,19,22 16:2,9 | 5:7,9 6:6 10:21,24 |
| met  7:20 14:7,10 | 18:3 | 17:25 | 16:5,7 20:16,18 |
| 14:11 | numerous  32:9 | page  6:11,17 11:25 | 22:20,22 23:12 |
| mine  18:19 | ny  2:6 | 15:17,18 17:8,10 | 26:8 27:4 28:22 |
| moment  7:13,16 | | 18:2 22:19 23:11 | 29:3 36:9,10,11,13 |
| money  18:22 19:4 | **o** | 25:16 27:3 29:10 | 36:14,15,16,17,18 |
| 20:13 24:12 25:10 | o  4:10 | 31:20 36:3,8 38:5 | 36:19 |
| 25:11 | oakley  1:22 37:4 | paid  15:11,12 | planning  33:24 |
| monitors  6:3 8:18 | 37:21 | 25:21,23 | please  3:7,10 17:2 |
| 8:19,20 | obligated  17:12 | panera  32:2 33:17 | pmb  10:14 |
| morning  3:13,14 | 18:6 | papers  33:9 | point  18:25 35:4 |
| | observation  34:16 | paragraph  16:13 | position  4:11,12 |
| **n** | obtain  4:19 18:16 | 17:2,9 29:13 | positions  4:23 |
| n  2:3 3:2 4:10 | 19:14 | 31:22 32:2,8,19,24 | post  21:24 30:20 |
| 19:21 36:2 | obtained  18:18 | participants  34:17 | prepare  6:15,19 |
| name  3:6 8:11 | office  3:22 | participation | 6:22,24 7:7 |
| 10:14 18:20,24 | officer  23:2 | 33:16 | prepared  7:4,9 |
| 19:20 22:16 38:3 | officers  23:15 | parties  37:12 | present  2:9 30:11 |
| national  11:9 | oil  5:3 | partner  23:2 | prior  4:22 |
| 15:20 | okay  4:16 6:10 | party  1:21 | probably  8:5 |
| nature  7:24 | 11:3 12:3 16:8 | pause  10:3 | profession  14:12 |
| need  7:14 | 17:19 29:12 30:23 | pay  10:6 13:5 19:4 | projectors  6:3 |
| needed  10:6 | 31:21,25 | 20:10,13 24:20 | promissory  10:19 |
| needing  9:25 | once  8:4 | 25:10,11 | 10:25 36:11 |
| nevada  22:24 | operations  5:15,24 | paying  24:15 | provide  9:16,24 |
| never  9:7,9 29:22 | opinion  34:16,20 | payment  11:21 | provided  9:20 |
| new  1:2,3,16,16,23 | orange  13:22 | 16:12 17:9 26:19 | public  1:22 3:3 5:2 |
| 3:3 4:25 16:14,15 | order  10:2,10,12 | 26:20,22 | 35:20 37:5 38:24 |
| 19:13 22:12 37:6 | 20:10 | payments  17:10 | pursuant  4:3 |
| nina  3:25 | original  15:3 | 17:13,15 18:3,7,9 | 26:12 27:14 |
| non  1:21 | outcome  37:14 | 18:13,14,17 19:9 | put  4:6 7:13 24:24 |
| normal  8:5 | owed  25:10,13 | percentage  21:8 | |
| north  5:25 | owned  16:20 | person  23:6 28:19 | **r** |
| notary  1:22 3:3 | 19:18 | pg  36:15,16,18 | r  2:3 37:2 |
| 35:20 37:5 38:24 | owner  22:4 | phonetic  3:25 4:2 | read  31:22 32:19 |
| note  10:19,25 11:8 | ownership  19:12 | | |
| 24:23,24 27:8 | 20:11 29:17 31:14 | | |

**really** 8:2,6
**reason** 38:5
**reasonable** 31:5
**recall** 8:11 27:17
**received** 4:20,21
  12:13 26:21
**recognize** 6:12
**recollection** 7:5,15
  11:10,24 15:25
  22:16 25:17
**record** 3:6,10
  10:16,18 15:13,15
  15:16 17:20,22,23
  18:23 19:22,24
  28:24 29:2 31:15
  31:17 33:12,14
  37:9
**records** 12:18
**refer** 15:22
**referenced** 16:17
  16:22
**referred** 23:3
**refers** 15:19 16:13
  32:2
**reflect** 23:25
**refresh** 7:5,15
  11:10,24 15:25
  25:16
**regard** 13:6
**regarding** 8:3
  33:25 34:11,23
**related** 25:19
  37:11
**relationship** 7:18
  7:24 8:2 14:5
**remember** 6:21
  9:24 10:14 18:22
  19:20
**remembering**
  18:24

**renter** 24:10
**reporter** 3:16 5:7
  6:6,7 37:4
**represent** 21:4
**request** 7:10 31:24
  32:22
**required** 18:2
**resellers** 8:22
**resignation** 22:25
**resigning** 23:6
**resolution** 15:6,9
**resolve** 15:5 24:17
**responding** 14:9
**restaurant** 32:3
  33:17
**retain** 14:14 31:13
**retained** 36:20
**returning** 11:14
**revenue** 5:23
**review** 31:3
**reviewed** 31:4
**reviewing** 6:8
**right** 4:6 6:5
**role** 8:24 9:5 14:22
**runnings** 5:16

**s**

**s** 1:8,14 2:3 3:2
  4:10 5:1 6:1 7:1
  8:1 9:1 10:1 11:1
  12:1 13:1 14:1
  15:1 16:1 17:1
  18:1 19:1 20:1
  21:1 22:1 23:1
  24:1 25:1 26:1
  27:1 28:1 29:1
  30:1 31:1 32:1
  33:1 34:1 35:1
  36:1,7 37:1 38:1,5
**sale** 5:15
**salveson** 1:6 2:9
  7:8 14:2,4,5 18:25

19:16 20:6 21:3
  25:6,21,23 26:3,14
  27:15,21 28:2,14
  28:14,18 29:15,18
  30:9 31:7 32:6,8
  32:18 33:11,19
  34:3,10,19,24
**salveson's** 14:12
  26:24
**santa** 13:22
**says** 7:3 11:9
  15:19 17:9 29:14
**schedule** 16:12
  17:10 18:2
**scope** 5:21
**screen** 6:4
**second** 9:19 16:12
  18:21
**secret** 34:2
**secretary** 22:24
  23:4
**see** 11:25 16:15
  18:4 29:18 32:10
  33:3
**seen** 29:5,8,23
**sell** 6:3
**selling** 20:3
**sent** 3:24 13:19
  30:24 31:3
**separate** 14:20
**september** 23:21
  24:2
**served** 13:18
**set** 37:8,15
**settlement** 15:20
  16:2,4,9 17:9,16
  17:25 36:13
**seventh** 2:5
**sheet** 38:2
**shock** 13:20

**shore** 2:4 3:22
**shorthand** 37:4
**sign** 11:22 32:10
**signatory** 20:21,23
**signature** 6:17
  20:25 23:8,9,18
  26:15,24 27:12
  37:19
**signed** 6:11
**signing** 27:17
  32:25 33:7,10
**situation** 24:17
**sold** 8:18,22 26:13
**sole** 24:5 28:15
**solution** 20:7,9,10
**sort** 19:8
**sought** 24:16
**sourced** 8:20
**specific** 18:3
**spell** 4:9
**spoken** 8:3
**started** 7:21 8:10
  8:23
**starting** 17:8
**state** 1:2,23 3:3,6,9
  22:24 23:4,16
  37:5
**stay** 18:23
**steve** 7:9,11,11,12
  7:17,19 9:17
  11:20 12:2 13:9
  13:10,17 14:8
  16:21 17:14 21:6
  23:7 24:10,13,19
  29:4
**steven** 1:12 3:24
**street** 2:5 16:14
  22:14
**subscribed** 35:17
  38:20

| | | | |
|---|---|---|---|
| subscriber 23:3 | timeframe 29:15 | understand 18:23 | witness's 20:25 |
| suit 13:17 | times 9:24 12:11 | 29:24,25 30:25 | woo 1:12 3:24,25 |
| suite 2:5 | 35:4 | 31:6 32:12,15 | 7:12,18,18,19 |
| summary 4:14 | title 15:19 23:22 | 33:7,9 34:18 35:3 | 11:22 12:2,15,19 |
| summer 9:22,22 | today 4:4 7:25 8:2 | understanding | 12:23 13:9,10,17 |
| sung 1:20 3:8,22 | told 25:19 | 22:3 28:13,17 | 14:8,11 16:21 |
| 5:8 6:9 26:15 | topics 34:5 | 30:18 31:12 | 18:6,9 19:3,8 20:2 |
| 29:15 32:9,24 | total 15:11 | understood 30:7 | 20:6,23 21:6,12,15 |
| 35:15 37:7 38:3 | transaction 28:6 | 30:14 31:2 33:18 | 21:25 22:6 23:7 |
| 38:19 | 30:4,12,17 31:6 | 33:20 34:20 | 27:20 28:2,4 29:4 |
| supreme 1:2 | 33:21,22 34:21 | university 4:18 | 30:11,22 31:10,12 |
| sworn 3:2 35:17 | 35:3 | unwittingly 29:16 | 32:6 34:6,17,22 |
| 37:8 38:20 | transactions 33:25 | 29:21,23 | woo's 23:8 28:10 |
| | 34:23 | usc 4:17 | word 29:23 |
| **t** | transfer 16:22 | use 24:22 | worked 5:2,3 |
| t 6:5 36:7 37:2,2 | 19:16 21:5,10,19 | utilized 8:17 | 19:15,15 |
| take 4:2 7:16 11:2 | 21:25 22:4 26:19 | | working 9:4 |
| 16:8 20:11 22:23 | 27:14,20 28:14,18 | **v** | worldwide 5:20 |
| 25:9 | 29:17 32:17 33:2 | v 4:10 | 5:21 |
| taken 33:23 | 33:25 34:11 | valuable 26:18 | |
| talk 9:18 14:4 | transferred 16:23 | vendors 8:21 | **x** |
| talked 13:25 24:19 | 16:24 25:2 31:7 | viewsonic 4:8 7:21 | x 1:5,14 36:2,7 |
| talking 14:23 | 34:18 | 8:7,16,18,21 | |
| 17:24 | transferring 30:8 | volunteered 25:9 | **y** |
| tell 5:11 9:20 | 30:23 33:19 | | y 1:12 3:2,24 |
| terms 8:4 | transfers 33:11 | **w** | year 13:16 |
| testified 3:4 | trial 1:20 | w 4:10 | years 4:12 7:20 |
| testimony 37:10 | true 37:9 | way 19:21 21:11 | 8:5 |
| thereof 26:22 | trustee 23:2 | 30:18 37:13 | yi 1:20 3:8,13,22 |
| 37:15 | trying 18:21 | ways 24:19 | 4:7 5:1,8 6:1,9,13 |
| think 13:15 29:7 | turn 17:8 29:10 | west 16:14 22:13 | 7:1 8:1 9:1 10:1 |
| 29:23 | 31:19 | wife 13:19 16:21 | 11:1 12:1 13:1 |
| third 11:25 | two 10:25 18:2 | 28:10 31:13 | 14:1 15:1,16 16:1 |
| thought 31:2 | 26:16 34:5 | wilson 2:7 3:5,15 | 17:1,24 18:1 19:1 |
| three 15:17 27:23 | type 30:2 | 5:6 10:16 15:13 | 20:1,18 21:1 22:1 |
| 27:25 33:21 | | 15:16 17:19,23 | 23:1 24:1 25:1 |
| time 1:21 3:20 | **u** | 19:22,25 28:24 | 26:1,15 27:1 28:1 |
| 14:7,7,15 17:2 | u 3:2 | 31:15,18 33:12,15 | 29:1,15 30:1 31:1 |
| 18:25 19:3,7,18 | u.s. 8:22 | 36:4 | 32:1,9,24 33:1,24 |
| 22:7,10 24:16 | ucal 5:3 | withheld 34:14 | 34:1 35:1,15 36:1 |
| 25:2 30:3 32:13 | undated 6:12 | witness 1:21 31:23 | 37:1,7 38:1,3,19 |
| 34:25 35:5 | | 32:21 37:7,10,15 | |

| york | 1:2,3,16,16 |
|---|---|
| | 1:23 3:3 16:14,15 |
| | 19:13 22:12 37:6 |

**z**

| zauderer | 2:4 |
|---|---|
| zuaderer | 3:23 |

New York Code

Civil Practice Law and Rules

Article 31 Disclosure, Section 3116

(a) Signing. The deposition shall be submitted to the witness for examination and shall be read to or by him or her, and any changes in form or substance which the witness desires to make shall be entered at the end of the deposition with a statement of the reasons given by the witness for making them. The deposition shall then be signed by the witness before any officer authorized to administer an oath. If the witness fails to sign and return the deposition within sixty days, it may be used as fully as though signed. No changes to the transcript may be made by the witness more than sixty days after submission to the witness for examination.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.